# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

MAURICE LAMONT ARCHER,      :
      :
      Plaintiff,      :
      :
v.      :      Civil Action No. 3:24-cv-42
      :
EQUIFAX INFORMATION SERVICES LLC,      :
and TRANS UNION, LLC      :
      :
      Defendants.      :
_____ :

## COMPLAINT

Maurice Lamont Archer ("Plaintiff" or "Mr. Archer"), a living, breathing, 40-year-old consumer, brings this Complaint against Equifax Information Services LLC ("Defendant Equifax" or "Equifax") and Trans Union, LLC ("Defendant Trans Union" or "Trans Union") (collectively, "Defendants"), for actual, statutory, and punitive damages, costs, and attorneys' fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq*., arising from Defendants' inaccurate credit reporting wherein Defendants published consumer reports to Plaintiff's creditors that falsely stated that he is deceased and has no credit score.

## PRELIMINARY STATEMENT

1.      This is an action for statutory, actual, and punitive damages, costs, and attorneys' fees brought pursuant to the FCRA, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2.      The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, ***accuracy***, relevancy, and proper utilization of such information." 15

U.S.C. § 1681 (emphasis added). In furtherance of its underlying purposes, the FCRA sets out requirements and obligations that consumer reporting agencies must follow when consumers dispute the accuracy of the information reported in their credit reports.

3.     This case concerns Defendant's inaccurate reporting of Plaintiff as deceased and without a credit score.

4.     Plaintiff put Defendant on notice of its erroneous credit reporting via multiple written dispute letters. However, on several occasions, Defendants failed to reinvestigate or respond to Plaintiff's disputes within the required 30 days.

5.     Accordingly, Plaintiff brings claims against Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of the contents of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

6.     Plaintiff also brings claims against Defendants for their failure to fulfill their reinvestigation obligations, in violation of the FCRA, 15 U.S.C. § 1681i(a)(1)(A).

## INTRODUCTION

7.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

8.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is

disseminated and/or obtained about them. In fact, the credit bureaus acknowledge this potential for misuse and resulting damage every time they sell their credit monitoring services to consumers and third parties.

9.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

10.     "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

11.     Congress made the following findings when it enacted the FCRA in 1970:

    i.   The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system;

    ii.  An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers;

    iii. Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers; and

    iv.  There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

12.     Thus, "[t]he FCRA evinces Congress's intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit

3

information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

13.     The three major national CRAs are Equifax Information Services LLC, Experian Information Solutions, Inc., and Trans Union, LLC.

14.     These CRAs sell credit information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

15.     These CRAs also sell credit information to "resellers" of consumer reports, like Universal Credit Services, who assemble and merge the credit information obtained from the CRAs into a 3-bureau credit report, also known as a "tri-merge" or "merged infile" credit report and sell them to various mortgage lenders throughout the country.

16.     Merged infile credit reports are unique to the mortgage industry because applying for a mortgage loan is in many ways different than applying for other types of loans, as mortgage lenders typically require a credit score from all three of the CRAs before making a lending decision for a given consumer.

17.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C.§1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

18.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period

beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

19.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

20.     This action seeks actual, statutory, and punitive damages, and costs and attorneys' fees from Defendants for their willful and/or negligent violations of the FCRA, 15 U.S.C. §§ 1681, *et seq.*, as described herein.

## THE PARTIES

21.     Plaintiff Maurice Lamont Archer ("Plaintiff" or "Mr. Archer") is a natural person who resides in Richmond, Virginia, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

22.     Defendant Equifax Information Services LLC ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the Commonwealth of Virginia, including within this District.

23.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

24.     Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 2 Baldwin Place, Chester,

PA 19022, and is authorized to do business in the Commonwealth of Virginia, including within this District.

25.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allow claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

28.     The FCRA governs the conduct of consumer reporting agencies to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

29.     The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personal, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information…." 15 U.S.C. § 1681(b).

30.     The FCRA further requires that when preparing consumer reports a consumer reporting agency must follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

### Defendants' Processing of Credit Information

31.     The Defendants regularly receive information about consumers from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

32.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

33.     The Defendants collect information from thousands of furnishers.

34.     The process by which the Defendants receive, sort, and store information is largely electronic.

35.     Furnishers report credit information to the Defendants through the use of coded tapes that are transmitted to the Defendants on a monthly basis through software known as Metro 2.

36.     Defendants take the credit information reported by furnishers and create consumer credit files.

37.     The Defendants maintains credit files on more than 200 million consumers.

38.     Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

### The Defendants' Practices Concerning the Sale of Reports on "Deceased" Consumers

39.     The Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

40.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

41.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Defendants, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

42.     The Defendants routinely place a "deceased" notation or marking on reports when they are advised by any of their many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

43.     The Defendants furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

44.     The Defendants do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

45.     The Defendants do not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

46.     The Defendants do not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

47.     In some cases, in order to assure accuracy, the Defendants may send letters and/or other communications to consumers when certain information that may be considered suspicious

8

or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. The Defendants do not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to it to be placed in said consumer's credit file or report.

48.     Defendants regularly receive the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that the government believes to be deceased. But Defendants do not cross-reference the "X" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

49.     Defendants will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

50.     Defendants do not employ any procedures at all to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

51.     Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendants do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark in that consumer's file.

52.     Even in instances where the purportedly deceased consumer communicates directly with Defendants, Defendants do not employ any procedures to assure that a consumer with a

"deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

53.     Once a "deceased" mark is placed upon a consumer's report, Defendants will not calculate and will not provide a credit score for that consumer.

54.     Upon Defendants' reports with a "deceased" mark sold to third parties, Defendants never calculate or provide a credit score for that consumer and instead report that consumer's credit score as "N/A."

55.     Defendants know that third party credit issuers require a credit score in order to process a given credit application.

56.     Defendants know that consumers without credit scores are unable to secure any credit from most credit issuers.

57.     Defendants know that living consumers are routinely turned down for credit specifically because Defendants are reporting them as "deceased" and without a credit score.

58.     Defendants have been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendants are inaccurately reporting them as "deceased" and without a credit score.

59.     Defendants have received and documented many disputes from consumers complaining that their Equifax and Trans Union credit reports had them erroneously marked as "deceased."

60.     Defendants know that thousands of consumers are erroneously marked as "deceased" on their Equifax and Trans Union credit reports via an erroneous furnishing of the "X" code, even when said consumers are not on the Death Master File and are, in fact, alive.

61.     Nevertheless, Defendants do not employ any procedures to assure that a consumer marked as "deceased" on their Equifax and Trans Union credit reports is, in fact, deceased.

62.     Even consumers who dispute the erroneous "deceased" status on their Equifax and Trans Union credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

63.     Defendants do not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

64.     Nor do Defendants employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

65.     For years after a consumer's actual death, Defendants will continue to sell credit reports about that consumer.

66.     Defendants will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

67.     Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

68.     Defendants profit from the sale of reports on deceased consumers.

69.     Defendants have in their respective credit reporting database many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

70.     Defendants know that truly deceased consumers do not apply for credit.

71.     Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendants to be a common and major source of identity theft.

72.     Defendants know that identity theft and credit fraud are serious and widespread problems in our society.

73.     Defendants warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

74.     Defendants have no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

75.     Defendants sell reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

76.     For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendants to sell their credit reports, absent a court order.

77.     Defendants know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

12

**Plaintiff Discovers Defendants Equifax and Trans Union are Falsely Reporting Him as Deceased in February 2022**

78.     Plaintiff, who had recently gone through a bankruptcy and desired to rebuild his credit, applied for and received a credit card through First Premier Bank in or around mid-February 2022.

79.     As part of his efforts to rebuild his credit, Plaintiff then called Defendant Equifax on or around February 18, 2022, to inquire about his credit score and any other information it could provide him related to his credit and his efforts to rebuild it.

80.     The Equifax representative Plaintiff spoke to informed him that one of the other credit bureaus, namely Trans Union, was reporting him as deceased and that Trans Union had informed Equifax of the same.

81.     Shortly after speaking with the Equifax representative and seeking to confirm whether any of the other credit bureaus were inaccurately reporting him as deceased, Plaintiff requested copies of his Experian and Trans Union credit reports online.

82.     On or before February 21, 2022, Plaintiff received a postcard from Defendant Equifax that stated, in relevant part, the following: "Per your request, a death notice has been added to the deceased consumer's credit file. To eliminate the need for you to also contact Experian and TransUnion, we will forward your death notice request to them on your behalf."

83.     Plaintiff was shocked and dismayed upon discovering Equifax's inaccurate reporting and fearful of the negative impact it may have on his credit score and future financial situation.

84.     Plaintiff never requested that a death notice be added to his Equifax credit file.

85.     On or about February 28, 2022, Plaintiff received a copy of his Trans Union credit report via mail. After reviewing its contents, Plaintiff discovered that his Trans Union credit report

contained two inaccurate notations indicating that he is deceased. The first inaccurate deceased notation stated, "**Deceased Date:** 01/01/2022," and the second, which was located at the bottom of the report under a heading titled, Consumer Statement, stated, "CONSUMER IS DECEASED. DATE OF DEATH IS 01/01/2022. DATED 02/21/2022." (Emphasis in original.)

86. Plaintiff was shocked and dismayed upon discovering Trans Union's inaccurate reporting and fearful of the negative impact it may have on his credit score and future financial situation.

87. Plaintiff never requested that a death notice be added to his Trans Union credit file.

**Plaintiff Disputes the Inaccurate Deceased Reporting with Defendants Equifax and Trans Union in February 2022**

88. On or about February 28, 2022, Plaintiff contacted Equifax by phone to inquire further as to why he received the postcard stating that a death notice had been added to his credit file and what, if anything, he could do to correct the issue and have the death notice removed from his credit file.

89. During this phone call, an Equifax representative informed Plaintiff that Equifax was in fact reporting him as deceased in his credit file and credit report. Plaintiff immediately informed the representative that he clearly was alive and not deceased, and then Plaintiff inquired about what he needed to do in order to dispute Equifax's inaccurate credit reporting. The Equifax representative instructed Plaintiff to send a letter to Equifax's dispute department with a copy of his driver's license and Social Security card.

90. On or about February 28, 2022, Plaintiff contacted Trans Union by phone to inquire further as to why a date of death and consumer statement regarding death had been added to his credit file and what, if anything, he could do to correct the issue and have the death notices removed from his credit file.

91.    During this phone call, a Trans Union representative informed Plaintiff that, according to Trans Union records, there was not a deceased notation appearing on his credit file. Plaintiff immediately informed the representative that he clearly was alive and not deceased, that he had seen a copy of his Trans Union credit report with the two deceased notations, and then Plaintiff stated that he was disputing the inaccurate deceased notations and requested that they be removed from his report.

92.    Trans Union failed to conduct a reinvestigation of Plaintiff's February 28, 2022 telephonic dispute of the inaccurate deceased reporting and failed to respond to Plaintiff's February 28, 2022 telephonic dispute in writing.

93.    Trans Union failed to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and to record the current status of the disputed information or delete the inaccurate deceased notation from Plaintiff's credit file and report before the end of the 30-day period beginning on the date on which Trans Union received notice of the dispute from Plaintiff, as required by 15 U.S.C. § 1681i(a)(1)(A).

94.    The following day, on March 1, 2022, Plaintiff mailed a letter addressed to Equifax's Dispute Department stating that he received a notice in the mail from Equifax informing him that it added a death notice to his credit file. Plaintiff also requested that Equifax rectify/correct the death notice. Plaintiff's dispute letter contained his full name, current address, current telephone number, signature, and a copy of his driver's license and Social Security card were attached to it, as Plaintiff was instructed to do by Equifax's representative.

**Synchrony Bank Denies Plaintiff's Credit Application in March 2022**

95.    In March 2022, Plaintiff sought to purchase a gift for his grandfather and applied for a JC Penney Master Card, provided through Synchrony Bank ("Synchrony").

96.     On or about, March 10, 2022, Plaintiff submitted a credit application through Synchrony to obtain financing for his planned purchase from JC Penney. As part of his credit application, Plaintiff provided Synchrony with his personal identification information, including his Social Security number, and authorized it to obtain his credit reports.

97.     In order to determine whether Plaintiff qualified for the credit card he sought, Synchrony obtained a copy of Plaintiff's credit report from Trans Union.

98.     On or about March 10, 2022, Synchrony obtained a copy of Plaintiff's credit report and credit score from Trans Union.

99.     Trans Union failed to return a credit score for Plaintiff and, instead, reported Plaintiff as "deceased."

100.    Trans Union's consumer report regarding Plaintiff was grossly inaccurate: Plaintiff is not deceased and has a credit score.

101.    The credit report Trans Union provided to Synchrony regarding Plaintiff was patently incorrect on its face – Trans Union failed to return a credit score for Plaintiff and reported him as "deceased." Trans Union's deceased reporting was patently incorrect because Plaintiff is alive and has a credit score.

102.    Equifax provided Trans Union with the inaccurate deceased information in the first instance, which lead Trans Union to believe and report that Plaintiff is deceased.

103.    On or about March 14, 2022 Synchrony mailed written correspondence to Plaintiff, informing him that his credit application had been denied because "Credit bureau reports applicant is deceased." Synchrony's correspondence specifically informed Plaintiff that its credit determination was based on the contents of his credit report as provided by Trans Union.

104.    By reporting Plaintiff as "deceased" and without a credit score to Synchrony, despite the fact that Plaintiff is alive and was alive in March 2022, Defendant Trans Union failed to follow reasonable procedures to assure the maximum possible accuracy of the contents of Plaintiff's credit file and report, in violation of 15 U.S.C. § 1681e(b).

105.    By reporting Plaintiff as "deceased" to Trans Union, despite the fact that Plaintiff is alive and was alive in March 2022, Defendant Equifax failed to follow reasonable procedures to assure the maximum possible accuracy of the contents of Plaintiff's credit file and report, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff's Third Dispute of the Inaccurate Deceased Reporting
with Defendant Equifax in March 2022**

106.    On March 28, 2022, Plaintiff contacted Equifax by phone to inquire about the status of his March 1, 2022 dispute letter and again disputed Equifax's inaccurate deceased reporting. The Equifax representative that Plaintiff spoke to on the phone informed him that, according to Equifax's records, Equifax never received Plaintiff's March 1, 2022 dispute letter.

107.    Equifax failed to conduct a reinvestigation of Plaintiff's March 2022 dispute of the inaccurate deceased reporting and failed to respond to Plaintiff's March 2022 dispute letter.

108.    Equifax failed to conduct a reinvestigation of Plaintiff's two telephonic disputes in February 2022 and March 2022 and failed to respond to either telephonic dispute in writing.

109.    Equifax failed to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and to record the current status of the disputed information or delete the inaccurate deceased notation from Plaintiff's credit file and report before the end of the 30-day period beginning on the date on which Equifax received notice of the disputes from Plaintiff, as required by 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff's Second Dispute of the Inaccurate Deceased Reporting
with Defendant Trans Union in April 2022**

110.    On or about April 13, 2022, extremely stressed, anxious, and upset by Trans Union's inaccurate deceased reporting, despite being assured by Trans Union a little over a month prior that there were no deceased notations on his credit file, Plaintiff mailed a dispute letter to Trans Union, which stated among other information, the following:

| | |
|---|---|
| Deceased Date:<br><br>01/01/2022 | Trans Union is reporting that I have a deceased date of 01/01/2022. This is inaccurate—I am not dead, I am alive. This is grossly inaccurate and should not be reporting on my credit file. Please remove this notation from my file immediately. |
| Consumer Statement: #HK# CONSUMER IS DECEASED. DATE OF DEATH IS 01/01/2022. DATED 02/21/2022 | Trans Union is reporting this message in the "Consumer Statement" section of my credit file. I am not deceased – I am alive. No one should be reporting me as deceased. Certainly, I did not call and report myself as deceased. Please remove this "consumer statement" from my credit file immediately. |

111.    Plaintiff also referenced his previous telephonic dispute with Trans Union in February 2022 where the representative dismissed his dispute and insisted there were no deceased notation on his Trans Union credit file.

112.    Plaintiff requested in his dispute letter that Trans Union reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

**Defendant Trans Union's Response to Plaintiff's April 2022 Dispute**

113.    On or about April 25, 2022, Plaintiff received written correspondence from Trans Union stating that it "understand[s] that recently something on [his] credit report did not seem right to [him]" and included a copy of his full credit report.

114.    In the enclosed credit report, Trans Union had removed the above-referenced consumer statement that stated Plaintiff was deceased as of January 1, 2022 and that it had been added on February 21, 2022.

115.    However, Trans Union was still reporting and failed to remove the "**Deceased Date**" of January 1, 2022, from Plaintiff's credit file. (Emphasis in original.)

116.    By failing to remove the deceased date from Plaintiff's credit file and continuing to report him as deceased, Trans Union failed to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and to record the current status of the disputed information or delete the deceased date from Plaintiff's credit file before the end of the 30-day period beginning on the date on which Trans Union received notice of the dispute from Plaintiff, as required by 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff Obtains a Copy of His Equifax Credit Report in April 2022 and Discovers Defendant Equifax Continues to Falsely Report Him as Deceased**

117.    On or about April 26, 2022, Plaintiff obtained a copy of his Equifax credit report.

118.    Upon review, Plaintiff discovered that despite his prior disputes of the inaccurate deceased notation, Equifax continued to report a "**Date of Death**" of January 01, 2022, under the Personal Information heading on his Equifax credit report. (emphasis in original).

**Plaintiff's Third Dispute of the Inaccurate Deceased Reporting with Defendant Trans Union in May 2022**

119.    On or about May 10, 2022, Plaintiff, increasingly frustrated and anxious over Trans Union's continued inaccurate deceased reporting, and continuing to worry about what it meant for

his ability to obtain credit and rebuild his credit after his recent bankruptcy, mailed a third dispute to Trans Union.

120.    Plaintiff once again requested that Trans Union remove the deceased date from his credit file.

121.    Plaintiff also requested that Trans Union reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

### Defendant Trans Union's Response to Plaintiff's May 2022 Dispute

122.    On or about May 21, 2022, Trans Union mailed Plaintiff written correspondence in response to his prior dispute, which stated, "it didn't appear that you or a properly authorized third party sent it to us" despite the fact that the letter contained Plaintiff's personal identifying information, including his full legal name, date of birth, and Social Security number, and had a photocopy of his current driver's license and other relevant documents attached to it.

123.    Other than sending the form letter, Trans Union failed to reinvestigate, acknowledge, or respond to Plaintiff's May 10, 2022 dispute letter.

124.    By failing to remove the deceased date from Plaintiff's credit file and continuing to report him as deceased thereafter, Trans Union failed to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and to record the current status of the disputed information or delete the deceased date from Plaintiff's credit file before the end of the 30-day period beginning on the date on which Trans Union received notice of the dispute from Plaintiff, as required by 15 U.S.C. § 1681i(a)(1)(A).

### Plaintiff's Fourth Dispute of the Inaccurate Deceased Reporting with Defendant Trans Union in June 2022

125.    On or about June 6, 2022, Plaintiff, increasingly frustrated and anxious over Trans Union's continued inaccurate deceased reporting, and continuing to worry about what it meant for

his ability to obtain credit and rebuild his credit after his recent bankruptcy, mailed a fourth dispute to Trans Union.

126.    Plaintiff stated that the previous dispute, which Trans Union had ignored and responded to with a form letter, was from him and once again requested that Trans Union remove the deceased date of 01/01/2022 from his credit file.

127.    Plaintiff requested that Trans Union reinvestigate the disputed information, correct the reporting, and send him a corrected copy of his credit report.

128.    Plaintiff never received any communication from Trans Union in response to his June 6, 2022 dispute letter.

129.    By failing to respond to Plaintiff's dispute before the end of the 30-day period beginning on the date on which Trans Union received notice of the dispute, Trans Union's reinvestigation failed to adhere to the requirements of 15 U.S.C. § 1681i(a)(1)(A).

130.    As a result of Defendants Equifax and Trans Union's conduct, action, and inaction, Plaintiff suffered actual damages including being denied credit; loss of the ability to purchase and benefit from his good name and credit rating; detriment to his credit rating; out-of-pocket loss; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including, but not limited to, stress; anxiety; loss of sleep; fear of financial ruin; and the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and being reported as deceased and without a credit score.

131.    At all times pertinent hereto, Defendants Equifax and Trans Union were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

132.    At all times pertinent hereto, the conduct of Defendants, as well as that of their agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Plaintiff herein.

**COUNT I**
**15 U.S.C. § 1681e(b)**
**(Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy)**

133.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-132 of this Complaint as if fully stated herein.

134.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

135.    On multiple occasions, Defendants Equifax and Trans Union prepared patently false consumer reports regarding Plaintiff.

136.    Despite actual and implied knowledge that Plaintiff is not dead, Defendants Equifax and Trans Union readily sold such false credit reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

137.    Defendants Equifax and Trans Union violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the contents of the credit reports and credit files they published and maintain concerning Plaintiff.

138.    As a result of Defendants Equifax and Trans Union's conduct, action, and inaction, Plaintiff suffered actual damages including being denied credit; loss of the ability to purchase and benefit from his good name and credit rating; detriment to his credit rating; out-of-pocket loss; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including, but not limited to, stress; anxiety; loss of sleep; fear of financial ruin;

22

and the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and being reported as deceased and without a credit score.

139.    Defendants' conduct, action, and inaction were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

140.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT II
### 15 U.S.C. § 1681i
### (Failure to Perform Reasonable Reinvestigation)

141.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-132 of this Complaint as if fully stated herein.

142.    The FCRA mandates that Defendants Equifax and Trans Union investigate the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The FCRA imposes a 30-day time limitation for the completion of such an investigation. *Id.*

143.    The FCRA provides that if Defendants Equifax and Trans Union conduct an investigation of disputed information and confirm that the information is, in fact, inaccurate or are unable to verify the accuracy of the disputed information, they are required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

144.    Between February 2022 and June 2022, Plaintiff lodged multiple disputes with Defendants Equifax and Trans Union, pleading with them to comply with their statutory reinvestigation obligations and correct and/or delete specific items in his credit file that are patently

inaccurate, misleading, and highly damaging to him and his ability to obtain credit, namely, references to him being "deceased" and having a "date of death."

145.    Defendants Equifax and Trans Union failed to conduct an investigation within 30 days of receiving Plaintiff's disputes and, consequently, allowed patently false and highly damaging information to remain in Plaintiff's credit files and reports, namely, the deceased notations.

146.    Defendants Equifax and Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit files.

147.    As a result of Defendants Equifax and Trans Union's conduct, action, and inaction, Plaintiff suffered actual damages including being denied credit; loss of the ability to purchase and benefit from his good name and credit rating; detriment to his credit rating; out-of-pocket loss; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including, but not limited to, stress; anxiety; loss of sleep; fear of financial ruin; and the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and being reported as deceased and without a credit score.

148.    Defendants' conduct, action, and inaction were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

149.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a)      Determining that that Defendants negligently and/or willfully violated the FCRA as alleged herein;

b)      Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

c)      Awarding Plaintiff reasonable attorneys' fees and costs pursuant to 15 U.S.C. §§ 1681n and 1681o; and

d)      Granting further relief, in law or equity, as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

150.    Plaintiff demands a trial by jury.


                                    Respectfully submitted,
                                    **MAURICE LAMONT ARCHER**

                                    By:_____*/s/ Kristi C. Kelly*_____
                                    Kristi C. Kelly, VSB #72791
                                    Andrew J. Guzzo, VSB #82170
                                    Casey Nash, VSB #84261
                                    J. Patrick McNichol, VSB #92699
                                    Matthew G. Rosendahl, VSB # 93738
                                    **KELLY GUZZO, PLC**
                                    3925 Chain Bridge Road, Suite 202
                                    Fairfax, VA 22030
                                    (703) 424-7572 – Telephone
                                    (703) 591-0167 – Facsimile
                                    Email: kkelly@kellyguzzo.com
                                    Email: aguzzo@kellyguzzo.com
                                    Email: casey@kellyguzzo.com

Email: pat@kellyguzzo.com
Email: matt@kellyguzzo.com

Hans W. Lodge, MN Bar No. 0397012*
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 607-7794
Fax: (612) 584-4470
Email: hlodge@bm.net
*Pro Hac Vice Forthcoming*

*Counsel for Plaintiff*